IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IRWIN FOSTER, et al., | ) | No. CV-F-03-5306 REC SMS |
| | ) | |
| Plaintiffs, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| vs. | ) | JUDGMENT. |
| | ) | |
| CITY OF FRESNO, et al., | ) | (Doc. 68) |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

On April 4, 2005, the Court heard Defendants' motion for summary judgment or, in the alternative, for summary adjudication of certain issues.  Upon due consideration of the written and oral arguments of the parties and the record herein, Defendants' motion is GRANTED as set forth below.

**I.   Factual Background**[1]

This case centers around the death of Eric Daniel Foster ("Foster"), who was shot and killed by Fresno Police Department Officer Russell Cornelison.  Plaintiffs are Foster's parents, Irwin Foster and Anna Valles, and Foster's minor children and

_____

[1] The facts are taken from Defendants' Statement of Undisputed Material Facts ("UMF") unless otherwise noted.

1

surviving heirs at law, Eric Daniel Foster, Jr. and Gloria Emonie Foster, appearing by and through their guardian ad litem.

On August 15, 2002, Foster was shot and killed by Officer Cornelison.  In the hours immediately preceding the shooting, there were four separate armed robberies in Fresno.  All four victims indicated that the perpetrator was a black man with a gun who was in a white Chevrolet pick-up truck.  Two of the four victims subsequently identified Foster from a photo line-up, and another victim's wallet was found in Foster's vehicle.  The robberies were reported to the police shortly after they occurred.[2]

At approximately 2:40 a.m. on August 15, police broadcasts over the radio informed patrol officers the suspect of the armed robberies was a black male, wearing a dark, hooded sweatshirt and driving a white truck.  Officer Mike Roberts was traveling in his patrol unit when he saw a white truck matching the description of the suspect's vehicle.  The truck did not have its lights on and the officer was able to observe that the driver appeared to be a black male in a hooded sweatshirt.

The officer followed the truck but did not turn on his siren lights.  The suspect's vehicle ran through a red light and

---

[2] Defendants submitted a detailed factual background that set forth the specifics of the robberies.  Plaintiffs do not dispute these facts but argue that, for purposes of summary judgment, they are immaterial and prejudicial because there is no indication that Officer Cornelison knew these facts at the time of the shooting.  The Court agrees and has thus omitted these details.  Plaintiffs' objection is sustained.

collided with a red car carrying two passengers.  The suspect's vehicle flipped over and landed on its roof.

The suspect, later identified as Foster, climbed out of the overturned truck and began to run.  Officer Roberts shined his spotlight on Foster and ordered him to stop.  Foster ran towards a bush on the side of the street and Officer Roberts heard the sound of a chain link fence rattling as he continued to order Foster to surrender.

Foster came out from behind the bush for a brief period, during which his hands were on his waist with the tips of his fingers toward his pockets.  Officer Roberts thought Foster was reaching for a gun, but did not fire on him because he felt Foster was too far away to hit.  Foster climbed the fence and ran into an orchard.  Officer Roberts broadcast over the radio that Foster had fled on foot.

Officer Roberts returned to the overturned truck and looked through an open window into the interior of the cab, looking with a flashlight for the gun that had been reportedly used in the robberies.  Seeing none, Officer Roberts then broadcast over the radio that he was unable to find the gun and that the suspect might still be armed.  Assisting units arrived on the seen and Officer Ryan Engum conducted a second visual inspection of the truck, also using a flashlight.  He was unable to locate a gun and also announced his search results over the radio.  Later, when the truck was turned over and more thoroughly searched, a handgun was found.

1    Officers Russell Cornelison, Skye Leibee and Ezequiel
2  Suarez, who had been monitoring the radio frequency and learned
3  of the armed robberies, arrived at the scene to offer assistance.
4  They were informed that the robbery suspect had fled on foot into
5  the orchard and that he had possibly removed and discarded the
6  sweatshirt he was wearing.

7    The officers divided into two teams to search the orchard.
8  Officer Cornelison with his canine partner, a Belgian Malinois
9  named Saxon, as well as Officer Suarez and Officer Leibee formed
10  one team.  The officers were all aware that the suspect in the
11  series of robberies had been armed with a handgun and that a
12  search of the vehicle did not reveal a gun.

13    As the three officers proceeded into the orchard they
14  traveled north along a dirt road with orchard trees to the left
15  and a six foot fence covered with ivy to their right.  Officer
16  Cornelison led the team with Saxon in front.  Officer Leibee was
17  directly behind him providing cover and Officer Suarez was behind
18  Officer Leibee, also providing cover.

19    Shortly after the search of the orchard began, Saxon alerted
20  Officer Cornelison to the northeastern corner of the orchard
21  where they located the suspect hiding in the bushes along the
22  fence.  Because it was dark, Officer Cornelison shined his
23  flashlight on the suspect, who had his back towards the officers.
24  Officers Cornelison and Leibee identified themselves as police
25  and commanded several times that the suspect show his hands.  The
26  suspect, Foster, refused to comply.  Officer Cornelison warned

4

1  Foster that if he did not comply, the dog would be released.

2      Canine Saxon began to bark and Foster still refused to

3  comply.  Believing the suspect was armed with a gun allegedly

4  used in the preceding robberies, Officer Cornelison released

5  Saxon with two commands, to bite the suspect and to bring him to

6  Officer Cornelison.  Officer Cornelison then retrieved his

7  department handgun, held it with both hands and pointed it at

8  Foster.  Officers Leibee and Suarez maintained cover behind

9  Cornelison.

10      Saxon bit Foster on his lower back and initially Foster did

11  not move or react to the dog biting him.  Officer Cornelison

12  continued to give Foster commands to show his hands and come out

13  but Foster did not respond, even after being bitten.

14      The parties do not dispute the facts to this point.  There

15  is, however, a dispute as to what transpired immediately prior to

16  the shooting.  These facts will be discussed in more detail

17  below.  What is undisputed is that Officer Cornelison discharged

18  his weapon and shot Foster four times.  Foster, who was unarmed,

19  died as a result of the multiple gunshot wounds.

20      An autopsy was conducted by Dr. Gopal of the coroner's

21  office.  The toxicology report indicated that Foster's blood

22  tested positive for PCP and cannibinoids and that the urine test

23  confirmed those results and revealed the presence of a cocaine

24  metabolite.[3]

25  _____

26      [3]  The Court agrees with Plaintiffs that this information is
    irrelevant to the extent it was unknown to Officer Cornelison.

## II.   Procedural History

Plaintiffs filed their complaint on March 12, 2003.  A first amended complaint was filed on July 23, 2003 and a Second Amended Complaint ("SAC") was filed by stipulation of the parties on November 6, 2003.  The SAC names as Defendants the City of Fresno; City of Fresno Police Chief Jerry Dyer in his individual capacity; and City of Fresno Police Officer Russell Cornelison, also in his individual capacity.

The SAC states nine causes of action.[4]  The first three arise under 42 U.S.C. § 1983.  Claim one is by all Plaintiffs except Valles on behalf of Foster against Officer Cornelison and is based on violations of Foster's Fourth and Fourteenth Amendment rights.  Claim two is by all Plaintiffs on their own behalf against Cornelison and is based on violations of their rights under the Fourth and Fourteenth Amendments, including a Fourteenth Amendment right to be free of governmental influence with familial relationships.  Claim three is by all Plaintiffs on their own behalf and on behalf of Foster and is against Defendants City and Dyer.  It is based on the policies and customs of the City and Dyer to use, promote, or tolerate excessive force; ignoring and failing to investigate alleged abuses; and failure to adequately discipline and train.

Claim four is under state law and is brought by all

---

[4] The SAC includes allegations regarding violations of the First, Fifth and Ninth Amendments, however these allegations were voluntarily withdrawn per stipulation.  See Doc. 36.

Plaintiffs except Valles against all Defendants.  It asserts a violation of Plaintiffs' rights under the California Constitution and alleges that Defendants acted in concert to do so.  The remaining causes of action also arise under California law and are brought by all Plaintiffs except Valles on behalf of themselves and Foster.  The fifth and sixth claims are against Defendant Cornelison only and are for intentional and negligent wrongful death, respectively.  Claim seven is against Defendant Cornelison and the City and is for violation of Foster's civil rights under California law, Civil Code section 52.1.  Claim eight is against Defendant Cornelison and is for intentional infliction of emotional distress.  Claim nine is against Defendant Dyer and the City and is for negligent hiring, retention, training supervision and discipline.

Defendants moved for summary judgment.  Defendants argue that Plaintiffs Irwin Foster and Anna Valles lack standing to assert a survival action, that Plaintiffs' lack sufficient evidence to demonstrate an unconstitutional policy or practice on the part of the City or Defendant Dyer, that Defendant Cornelison's use of force was objectively reasonable and that he is entitled to qualified immunity.

## III.  Legal Standard

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is "material" if it is relevant to an

element of a claim or a defense, the existence of which may affect the outcome of the suit.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)). Materiality is determined by the substantive law governing a claim or a defense.  Id.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  Id.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  T.W. Elec., 809 F.2d at 630.

The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  Id. (citing Fed. R. Civ. P. 56(e)).  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  Id. (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290, 20 L. Ed. 2d 569,88 S.

1   Ct. 1575 (1968)).

2        The question for the Court is not whether the "evidence

3   unmistakably favors one side or the other, but whether a fair-

4   minded jury could return a verdict for the plaintiff on the

5   evidence presented."  United States ex rel. Anderson v. N.

6   Telecom, Inc., 52 F.3d 810, 815 (9th Cir. 1996).  This requires

7   more than the "mere existence of a scintilla of evidence in

8   support of the plaintiff's position;" there must be "evidence on

9   which the jury could reasonably find for the plaintiff."  Id.

10  The more implausible the claim or defense asserted by the

11  nonmoving party, the more persuasive its evidence must be to

12  avoid summary judgment.  Id.

13  **IV.  Unopposed Issues**

14       **A.  Standing of Plaintiffs Irwin Foster & Anna Valles**

15       The survivors of an individual who is killed as a result of

16  the application of excessive force may assert a Fourth Amendment

17  claim on that individual's behalf if the relevant state's law

18  authorizes a survival action.  Moreland v. Las Vegas Metropolitan

19  Police Dept., 159 F.3d 365, 369 (9th Cir. 1998).  Section 377.60

20  of the California Code of Civil Procedure provides that a

21  wrongful death action may be asserted by a the children of a

22  decedent.  Cal. Code Civ. Pro. § 377.60(a).  A parent may only

23  assert a wrongful death claim if there are no children or issue

24  or if he or she is "dependent on the decedent."  Id. at §

25  377.60(b).  "Dependence" refers to financial rather than

26  emotional dependency.  Perry v. Medina,, 192 Cal. App. 3d 603,

9

608-09 (1987).  To demonstrate financial dependence, a parent "must show that they were actually dependent, to some extent, upon the decedent for the necessaries of life."  Id. at 610.

Plaintiffs do not attempt to refute Defendants' evidence establishing that Foster did not provide any financial support for Irwin Foster.  Defs.' UMF Nos. 90-97.  At oral argument on the motion, Plaintiffs' counsel conceded the standing issue with respect to claims on behalf of Foster.[5]

Accordingly, because Plaintiffs have offered no evidence that either Valles or Irwin Foster were financially dependent on Foster, neither of them has standing to assert claims on behalf of Foster.  Summary judgment is GRANTED in favor of Defendants as to this issue.  This eliminates Plaintiff Irwin Foster from all claims except the second and the fourth and eliminates Plaintiff Valles from all claims except the second.

**B.  Liability of Defendants Dyer & the City of Fresno**

**1.  The Section 1983 Claim (Claim Three)**

"Plaintiffs do not contest defendants' motion for summary judgment on the third cause of action."  Pls.' Opp'n at 31.  This is the section 1983 claim.  Summary judgment as to this claim is

---

[5] Plaintiffs correctly point out in their opposition that the Ninth Circuit has recognized that a parent who claims loss of companionship as the result of the application of excessive force can bring a claim under the Fourteenth Amendment.  Curnow v. Ridgecrest Police, 952 F.2d 321, 325, (9th Cir. 1991) cert. denied 506 U.S. 972 (1992); Strandberg v. City of Helena, 791 F.2d 744, 748 (9th Cir. 1986).  However, this does not address Defendants' point that, as parents, Valles and Irwin Foster cannot assert claims on behalf of Foster.

GRANTED in favor of Defendants Dyer and the City of Fresno.

## 2. Negligent Hiring, Retention, Training, Supervision & Discipline (Claim Nine)

A claim for failure to train requires a legal duty to use due care, breach of that duty and that the breach be a proximate or legal cause of the injury.  Stewart v. United States, 797 F. Supp. 800, 804 (C.D. Cal. 1992).  Defendants argue that Plaintiffs have provided no evidence that supports this claim.[6]

Plaintiffs do not address claim nine in their opposition, and at oral argument on the motion, counsel for Plaintiffs acknowledged Plaintiffs' non-opposition.[7]  Accordingly, summary judgment as to claim nine is GRANTED in favor of Defendants Dyer and the City of Fresno.

## C. Liability Based on Violation of Plaintiffs' Fourth Amendment Rights (Claim Four)

Claim four asserts a violation of Plaintiffs' rights to be free of excessive force and unreasonable seizure under Article 1, section 13 of the California Constitution, the state law equivalent of the Fourth Amendment.  Compl. ¶50.  Defendants argue that Plaintiffs lack evidence to support a violation of

---

[6] Defendants' citation to Van Ort v. Estate of Stanewhich, 92 F.3d 831, 840 (9th Cir. 1996), is inapposite.  Van Ort supports the theory that if a public employee is acting outside the scope of his employment, which cannot be argued here, there can be no negligent supervision claim against the employing entity.

[7] At any rate, failure of a party to address a claim in an opposition to a motion for summary judgment may constitute a waiver of that claim.  See  Coufal Abogados v. AT&T, Inc., 223 F.3d 932, 937 (9th Cir. 2000); Doe v. Benicia Unified Sch. Dist., 206 F. Supp. 2d 1048, 1050 n.1 (E.D. Cal. 2002).

11

1   their own, personal Fourth Amendment rights.

2       At oral argument on the motion, Plaintiffs conceded that

3   there is no evidence to support a Fourth Amendment cause of

4   action based on the rights of Plaintiffs.  However, as discussed,

5   Plaintiffs Eric Foster, Jr. and Gloria Foster, Foster's surviving

6   children, may assert claims on behalf of Foster for the alleged

7   violation of Foster's rights.  Accordingly, summary judgment as

8   to claim four is GRANTED in favor of Defendants.

9   **V.   Liability of Officer Cornelison[8]**

10      The parties divide their arguments regarding Officer

11  Cornelison into two questions, a constitutional question and a

12  qualified immunity question.  These two questions both fall under

13  the rubric of qualified immunity.

14      The doctrine of qualified immunity promotes public service

15  by eliminating the risk of personal liability for official

16  decisions.  Harlow v. Fitzgerald, 457 U.S. 800, 814, 73 L. Ed. 2d

17  396, 102 S. Ct. 2727 (1982).  It "provides ample protection to

18  all but the plainly incompetent or those who knowingly violate

19  the law." Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271,

20  106 S. Ct. 1092 (1986).  Qualified immunity is not a defense on

21  the merits; it is an "entitlement not to stand trial or face the

22  burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200-02,

23  ─────────────────

24      [8] Defendants are entitled to summary judgment as to the
    portion of Plaintiffs' section 1983 claim on behalf of Foster that
25  is based on the Fourteenth Amendment.  The Supreme Court has held
    that excessive force cases are to be evaluated under the Fourth
    Amendment rather than the Fourteenth.  Graham v. Connor, 490 U.S.
26  386, 394-95, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989).

150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001).  It may be overcome only by a showing that (1) a constitutional right was in fact violated and (2) no reasonable officer could believe the defendant's actions were lawful in the context of fact-specific, analogous precedents.  Id.

There is some contradiction with respect to the policies at issue in an excessive force case involving qualified immunity. On the one hand, the Ninth Circuit has stated that, due to the fact-intensive nature of the inquiry, summary judgment "in excessive force cases should be granted sparingly." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).  On the other hand, the Supreme Court has stressed the importance of immunity being resolved at an early stage in the litigation. Saucier, 533 U.S. at 200-201.

**A.  Were Foster's Constitutional Rights Violated?**

**1. Legal Standard**

The threshold question in determining the question of qualified immunity is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[9] Saucier, 533 U.S. at 201.  In the case of disputed facts, their resolution and any credibility determinations "are manifestly the province

---

[9] Although the term "alleged" is used, the Ninth Circuit recently upheld a grant of summary judgment based on the determination of the constitutional violation question. Blanford v. Sacramento Co., 406 F.3d 1110 (9th Cir. 2005) (finding officers' actions not objectively unreasonable).

13

1  of a jury." Santos, 287 F.3d 846, 852 (9th Cir. 2002).

2      "[C]laims of excessive force are to be judged under the

3  Fourth Amendment's 'objective reasonableness' standard."

4  Brosseau v. Haugen, __ U.S. __, 160 L. Ed. 2d 583, 589, 125 S.

5  Ct. 596.  This question "is governed by the principles enunciated

6  in Tennessee v. Garner, 471 U.S. 1, 85 L. Ed. 2d 1, 105 S. Ct.

7  1694 (1985), and Graham v. Connor, 490 U.S. 386, 104 L. Ed. 2d

8  443, 109 S. Ct. 1865 (1989)." Id. at 588-89.

9      With respect to deadly force, the Court has explained that

10 "it is unreasonable for an officer to 'seize an unarmed,

11 nondangerous suspect by shooting him dead.'  But '[w]here the

12 officer has probable cause to believe that the suspect poses a

13 threat of serious physical harm, either to the officer or others,

14 it is not constitutionally unreasonable to prevent escape by

15 using deadly force.'" Id. (citations omitted).  The "broad

16 discretion that must be afforded to police officers who face a

17 tense situation," must be extended to mistakes of fact concerning

18 "the existence of probable cause" as well as to mistakes as to

19 what the law requires under particular circumstances. Jeffers v.

20 Gomez, 267 F.3d 895, 909 (9th Cir. 2001).

21     Reasonableness is an objective analysis and "must be judged

22 from the perspective of a reasonable officer on the scene, rather

23 than with the 20/20 vision of hindsight." Graham, 490 U.S. at

24 396.  The "question is whether the officers' actions are

25 'objectively reasonable' in light of the facts and circumstances

26 confronting them, without regard to their underlying intent or

1  motivation." <u>Id.</u> at 397 (citations omitted).

2  <u>Graham</u> set forth factors that should be considered in

3  determining reasonableness: "the severity of the crime at issue,

4  whether the suspect poses an immediate threat to the safety of

5  the officers or others, and whether he is actively resisting

6  arrest or attempting to evade arrest by flight." <u>Id.</u> (citing

7  <u>Garner</u>, 471 U.S. at 8-9 ("the question is whether the totality of

8  the circumstances justifie[s] a particular sort of . . .

9  seizure") (quotations omitted)); <u>see also</u> <u>Billington v. Smith</u>,

10 292 F.3d 1177, 1184 (9th Cir. 2002).  The most important of these

11 factors is the threat posed by the suspect.  <u>Smith v. City of</u>

12 <u>Hemet</u>, 394 F.3d 689, 702 (9th Cir. 2005).

13 The Ninth Circuit has admonished courts to use caution in

14 cases such as this:

15 > Deadly force cases pose a particularly difficult
> problem under this regime because the officer defendant
16 > is often the only surviving eyewitness.  Therefore, the
> judge must ensure that the officer is not taking
17 > advantage of the fact that the witness most likely to
> contradict his story–the person shot dead–is unable to
18 > testify.  The judge must carefully examine all the
> evidence in the record, such as medical reports,
19 > contemporaneous statements by the officer and the
> available physical evidence, as well as any expert
20 > testimony proffered by the plaintiff, to determine
> whether the officer's story is internally consistent
21 > and consistent with other known facts.  In other words,
> the court may not simply accept what may be a self-
22 > serving account by the police officer.  It must also
> look at the circumstantial evidence that, if believed,
23 > would tend to discredit the police officer's story, and
> consider whether this evidence could convince a
24 > rational factfinder that the officer acted
> unreasonably.

25

26 <u>Scott v. Henrich</u>, 39 F.3d 912, 915 (9th Cir. 1994) (citations

1  omitted).

2      On a motion for summary judgment, the question is thus

3  whether there is a genuine issue of material fact regarding

4  whether Officer Cornelison's conduct was objectively reasonable

5  in light of the facts and circumstances with which he was

6  confronted.  If there is not, then no constitutional right was

7  violated and Officer Cornelison is immune from suit.  If there is

8  a genuine issue of material fact, the constitutional violation is

9  assumed and the next question is whether the right was clearly

10  established at the time.

11              **2.  The __Graham__ Factors**

12      The force used by Officer Cornelison consisted of the use of

13  the canine Saxon and the use of his firearm.  Defendants argue

14  that Officer Cornelision's actions were objectively reasonable

15  based on the information he had at the time and that it was

16  proper for him to release Saxon and use deadly force.

17      Plaintiffs do not argue that the use of Saxon was

18  unreasonable.  Plaintiffs argue that on their version of the

19  facts, Officer Cornelison's use of deadly force was not

20  objectively reasonable.  To summarize, Plaintiffs argue that

21  Foster had emerged from the bushes and had turned such that

22  Officer Cornelison should have seen that Foster was unarmed.

23  Plaintiffs also assert that there are disputes as to the motion

24  made by Foster and the positions of either Officer Cornelison or

25  Foster at the time of and during the shooting.

26  ///

16

### a.  Severity of the Crime

It is undisputed that four armed robberies occurred on the night in question, that Foster was identified by two of the victims and that physical evidence connected him to a third. Defs.' UMF Nos. 10, 16, 26.  It is also undisputed that Officer Cornelison was aware that at least a couple of robberies had occurred and that the officers were pursuing the suspect in those cases.  Defs.' UMF Nos. 64-65.  It is also undisputed that Foster ran a red light and crashed his truck into another vehicle. Defs.' UMF No. 46.  Reckless driving can be a dangerous crime, and armed robbery is unarguably a serious and dangerous crime; the severity of the crime here is significant.

### b.  Attempting to Evade Arrest

It is undisputed that Foster fled from the scene of the car accident into the orchard.  Defs.' UMF No. 57.  It is likewise undisputed that when the officers located Foster he was crouched near a foliage-covered fence in the orchard.  Defs.' UMF Nos. 70, 72.  Foster had been attempting to evade arrest at the time of the shooting.

### c.  Resisting Arrest

Foster did not respond to the repeated commands of the officers to come out and raise his hands.  Defs.' UMF No. 73. Foster initially did not move or react to being bitten by Saxon, Defs.' UMF No. 79, and he did not respond to Officer Cornelison's continued commands to show his hands and come out.  Defs.' UMF Nos. 80-81.  Foster was resisting arrest in that he was being

1  non-compliant with the officers' orders to surrender.

2      **d.  Immediate Threat Posed by Foster**

3      As mentioned, this is the most important of the <u>Graham</u>

4  factors.  <u>See</u> <u>Smith</u>, 394 F.3d at 702.

5      **(1) Officer Cornelison Reasonably Believed**

6      **Foster Was Armed**

7      Plaintiffs do not dispute that "[a]ll the officers were

8  aware through radio traffic that the suspect in a series of

9  preceding robberies was armed with a handgun and that a search of

10  the vehicle revealed no gun."  Defs.' UMF No. 69.  Plaintiffs

11  also do not dispute that Officer Cornelison released Saxon

12  "[b]elieving the suspect was armed with the gun he used in the

13  preceding robberies . . .."  Defs.' UMF No. 76.  Accordingly, the

14  undisputed facts establish that, at the time of the shooting,

15  Officer Cornelison believed Foster was armed.

16      Plaintiffs' police procedures expert, Frank Saunders,

17  concluded that the officers' actions were inconsistent with the

18  tactics to be used in confronting an armed and dangerous suspect,

19  and thus the actions undermine Officer Cornelison's assertion

20  that he believed Foster was armed and dangerous.  Pls.' Opp'n at

21  16-17.  Two of the five reasons given by Mr. Saunders relate

22  solely to the actions of Officers Suarez and Leibee and are not

23  relevant to the question of whether Officer Cornelison's actions

24  were objectively reasonable.  The other three points are

25  unsupported by the evidence and are addressed in turn below.

26      Mr. Saunders asserts that Officer Cornelison's "seems to

have acted with total disregard for the safety of Saxon," and

that Officer Cornelison's use of the canine was contrary to

national police procedure standards.   Defendants argue properly

that this conclusion lacks foundation.   Mr. Saunders has never

been a canine officer and has no training with respect to

handling canines.   Saunders Depo. 27: 4-18.   Nor does Mr.

Saunders specify what the "national police standards" are for use

of a canine.   Further, it is undisputed that Mr. Saunders

received a copy of the Fresno Police Department's canine policies

and has no criticisms thereof.   Defs.' UMF NO. 108.   That Saxon

may have been put at risk is immaterial to whether Officer

Cornelison believed Foster was armed.   Moreover, Officer

Cornelison explained that a canine may be used in a situation in

which it would be inappropriate to use a human officer.

Cornelison Depo. 40:17-24.

Mr. Saunders' second assertion is that Officer Cornelison

acted inconsistently with "national officer safety police

procedures" because he failed to establish that his fellow

officers were covering him when he approached Foster.   Saunders

Decl. ¶ 9B.   Again, Defendants properly object because the

national police standards are unspecified.   Also, it is

undisputed that Officers Leibee and Suarez were providing cover

throughout the operation.   Defs.' UMF Nos. 71, 78.

Mr. Saunders' third assertion is that Officer Cornelison

acted inconsistently with "national standard police procedures"

as well as "(law enforcement) common sense" when Officer

19

Cornelison approached Foster without attempting to take cover.
Defendants again properly object to the unspecified national
standards.  Defendants also argue that Officer Cornelison
explained that he "did not want to take [his] eyes off the
suspect or put [his] back to [the suspect]."  Additionally,
Officer Cornelison testified that he believed Foster was "giving
up" when Foster raised his hand but that he, Officer Cornelison
still believed Foster was armed.  Cornelison Depo. 82:7-10.

Even if Mr. Saunders' conclusions were not lacking in
foundation, it remains undisputed that the officers were aware
via radio communications that Foster had been armed with a gun
and that a search of his vehicle did not reveal a gun.  Moreover,
the Ninth Circuit has held that, "even for summary judgment
purposes, 'the fact that an expert disagrees with the officer's
actions does not render the officer's actions unreasonable.'"
Billington, supra 292 F.3d at 1189 (quoting Reynolds v. County of
San Diego, 39 F.3d 912, 915 (9th Cir. 1994)).

**(2) Foster's Position Prior to the Shooting**

According to Officer Cornelison, after Saxon began biting
Foster the next thing Foster did was look back over his right
shoulder toward the officers and raise his right hand.
Cornelison Decl. ¶ 27; Leibee Decl. ¶ 24; Suarez Decl. ¶ 22.
Officer Cornelison then took "at least a couple" of steps toward
Foster such that he was approximately 10-15 feet away from
Foster.  Defs.' UMF No. 83.  Officer Cornelison testified that
Saxon was not able to pull Foster from the foliage and that there

1  was "[j]ust a little [movement] from the shaking from the dog

2  maybe, but no major movement."  Cornelison Depo. 77:4-5.

3       In contrast, Plaintiffs assert that Saxon was successful in

4  extracting Foster from the bushes, Suarez Depo. 46:4-11, and

5  argue that this undermines Officer Cornelison's claim that he

6  could not see Foster's hands.  Officer Suarez, who was providing

7  cover for his fellow officers and monitoring the orchard during

8  the incident, testified as follows:

9       Q.  Okay.  And did you see Mr. Foster move at all after
        the dog bit him?
10
        A.  Initially, no.  I believe a little later.  I don't
11      know if the dog may have brought the subject out
        slightly from the foliage, I'm not sure how much, but
12      movement was very little.

13      Q.  So before the shots were fired, you think the dog
        pulled Mr. Foster out from the foliage?
14
        A.  To the best of my recollection, yes, I believe so.
15
        Q.  How far away from the foliage did the dog pull Mr.
16      Foster out before the shots were fired?

17      A.  I don't remember.

18  Suarez Depo. 46:2-14.

19       Defendants, citing only the first question and answer,

20  assert that Plaintiffs have taken Officer Suarez's testimony out

21  of context and that it "in no way indicates that Saxon was

22  successful in removing Foster from the bushes."  Defs.' Reply at

23  4.  When read in its totality, Officer Suarez's testimony that he

24  believed Saxon pulled Foster from the foliage is inconsistent

25  with Officer Cornelison's testimony that Saxon was not able to

26  pull Foster from the foliage.  This fact is disputed and will be

21

viewed in the light most favorable to Plaintiffs.  However, even
assuming Saxon was able to pull Foster from the bushes, this
evidence does not indicate that Foster turned toward the officers
so that his hands were visible.  Indeed, Officer Suarez indicated
that immediately after he thought Foster had been pulled from the
bushes, he could not see Foster's hands.  Suarez Depo. 46:22-23.
To that extent, the testimony of the two officers is consistent
and does not create a genuine issue of material fact.

### (3) Foster's Movement Prior to the Shooting

Defendants argue that the following is an undisputed
material fact:

> 84.  After looking at the officers, Foster immediately
> turned, put his head down and jammed his hand back down
> to his waist or crotch area, began fumbling around,
> jerking his arm as if he was trying to grab something.
>
> [Evidence] 84.  Declaration of Russell Cornelison at
> ¶29; Declaration of Skye Leibee at ¶24.

Defs.' UMF No. 84.  Plaintiffs argue that this fact is disputed
as follows:

> Neither Officer Leibee nor Officer Suarez, both of whom
> had clear, unobstructed views of Mr. Foster, saw Mr.
> Foster fumble around or jerk his arm as if he was
> trying to grab something.
>
> Furthermore, it is undisputed that Mr. Foster was
> unarmed at the time of the shooting.  Accordingly,
> there would have been no reason for him to fumble
> around or jerk his arm.
>
> [Evidence] Deposition of Skye Leibee, Exh. B to Pyle
> Decl., at 41:5-7; 42:3-13; 45:13-16; 50:13-22;
> Deposition of Ezequiel Suarez, Exh. C to Pyle Decl., at
> 49:2-22.
>
> Officer Suarez, who, as mentioned, was dividing his

22

1  attention between monitoring the orchard for threats and the

2  scene involving Foster, testified in his deposition as follows:

3      Q.  How did Mr. Foster move?

4      A.  I don't know if he moved his arm - it appeared that
       he moved his arm forward and he kind of moved his body
5      in a forward motion.

6      Q.  Which arm did Mr. Foster move forward?

7      A.  I believe it was the right, right one.  He started
       moving it, and I [sic] that's when I had immediately
8      turned around.

9      . . .

10     Q.  Did Mr. Foster put his right arm out away from him
       as though he was trying to steady himself or catch his
11     balance?

12     A.  It did not appear to me that he did.  It looked
       like he was moving his hand forward.
13
       Q.  And did it look to you like Mr. Foster was trying
14     to retrieve a weapon of some kind?

15     A.  I'm not sure what he was trying to do, because I
       immediately turned around to look at the orchard.
16

17 Suarez Depo. 47:24-25, 48:1-6, 48:22-25, 49:1-6.  This evidence

18 is not inconsistent with Officer Cornelison's testimony and does

19 not, without more, constitute an issue of fact.

20     Officer Leibee, who was providing cover for Officer

21 Cornelison, testified in his deposition as follows:

22     Q.  Did Mr. Foster move any part of his body that you
       could see?
23
       A.  Yes.
24
       Q.  What part of his body did he move?
25
       A.  It was his right hand.
26

1     Q.  And what did Mr. Foster do with his right hand?

2     A.  *It momentarily came out from where it was concealed at*, and it appeared to me like he was trying to re-

3     balance himself, *and then it went back down*.

4     Q.  And could you see what Mr. Foster was doing with his right hand after he brought it back down?

5

6     A.  No.

    . . .

7

8     Q.  And was there anything about his motion that made you think he was trying to keep his balance?

9     A.  Just the motion that he made, it appeared to me like he was trying to regain his balance.  It wasn't -

10     he didn't put his hands up in the air like he was giving up.  Like I said, it was just something that

11     looked like he was trying to regain his balance.

12 Leibee Depo. 40:20-25, 41:1-7, 42:23-25, 43:1-4 (emphasis added).

13     It is undisputed that Foster moved his arm up and then moved

14 it back down, although there is a dispute as to why Foster raised

15 his arm.  Officer Leibee interpreted the motion as an attempt by

16 Foster to regain his balance, Leibee Depo. 43:1-4, while Officer

17 Cornelison believed that Foster was complying with the commands

18 to raise his hands.  Cornelison Depo. 77:13-15.  This dispute is

19 immaterial.  Neither officer indicated that they thought the

20 raising motion was threatening; it was the downward motion that

21 caused Officer Cornelison to fire.

22     Accordingly, although there is some dispute as to whether

23 Foster "jammed" his hands toward his crotch area, which will be

24 addressed in the next section, it is undisputed that Foster

25 raised his right arm up and then lowered it again.

26 ///

**(4) Foster's Putting His Arm Back Down**

Defendants argue that the movement of Foster's arm was threatening and that Officer Cornelison reasonably believed that Foster was reaching for a weapon and applied deadly force in response.  Defendants argue that Officer Cornelison felt he was under immediate threat and shot Foster to stop the threat.  Defs.' UMF No. 85 (disputed by Plaintiffs).  Officer Leibee also testified that Foster's "[p]utting his hand back down into his waistband or near his waistband area" was "threatening."  Leibee Depo. 44:18-24.

Plaintiffs assert that there is a dispute as to whether Officer Cornelison saw Foster fumbling around as though for a weapon.  Plaintiffs make three points with respect to this.

Plaintiffs argue first that Officer Suarez's actions undermine both Officer Cornelison's and Officer Leibee's descriptions of Foster's movement as threatening.  Plaintiffs assert that the movements were "so non-threatening that Officer Suarez, after seeing them, diverted his attention to the orchard to look for other signs of danger."  Pls.' Opp'n at 18.  Plaintiffs misconstrue Officer Suarez's actions and testimony.  Officer Suarez explained that he turned to look at the orchard, which he was responsible for covering, because he thought he heard a noise, not because the movement was non-threatening.  Suarez Depo. 47:17-23.  Notably, Officer Suarez testified that he turned around "while I was advising dispatch that it appeared the subject was reaching for something."  Id.  at 47:21-23.

Accordingly, the testimony of Officer Suarez, if anything, supports Officer Cornelison's determination that Foster was reaching for something and does not create an issue of material fact.

Plaintiffs argue second that neither Officer Leibee nor Officer Suarez saw Foster "jam" his hand down or fumble around for anything.  Plaintiffs are correct that neither officer described Foster's movement in this way although, as mentioned, Officer Leibee described the movement as "threatening" and Officer Suarez testified that he advised dispatch that Foster was reaching for something.  The descriptions of Officers Leibee and Suarez are not entirely consistent with that of Officer Cornelison.

Plaintiffs argue third that it is implausible that Foster was fumbling around for something because Foster was actually unarmed and that there was no reason for him to fumble around. Defendants argue in response that Foster was not aware that he had lost the gun that he had previously possess and was therefore searching for it.  This particular question - whether to believe that, in the time between Foster's fleeing the scene of the car accident and his discovery by the officers Foster realized he did not have his weapon, and thus Plaintiffs' version of the facts is the credible one; or whether Foster, who was under the influence of controlled substances, did not realize that he had lost his weapon and was reaching for it, thus supporting Defendants' version of the facts- would be a question of fact for a jury.

26

1    Again, viewing the facts in the light most favorable to

2  Plaintiffs, Plaintiffs' second and third points indicate a

3  dispute as to whether Foster jammed his hand down and fumbled

4  around as if reaching for a weapon or whether he simply moved his

5  hand down without fumbling.  The Court will assume for the

6  purposes of this motion that no fumbling or jamming occurred.

7              **(5) Failure of Officer Leibee to Fire**

8    It was immediately after Foster moved his arm that Officer

9  Cornelison fired his weapon.  As he did so, Officer Cornelison

10  stepped into Officer Leibee's line of fire.  Leibee Depo. 46:24-

11  25; 47:1-2.  Officer Leibee testified that he immediately moved

12  to his right and regained a clear view of Foster.  Leibee Depo.

13  47:11-16.  Plaintiffs argue that because Officer Leibee did not

14  fire at that time, it was unreasonable for Officer Cornelison to

15  have fired his weapon.  Plaintiffs support this with the

16  following testimony of Officer Leibee:

17      Q.  So what did you do when Officer Cornelison moved
        into your line of fire?
18
        A.  I moved to my right.
19
        Q.  How far did you move to your right?
20
        A.  Maybe one or two steps.
21
        Q.  And did you at that point have a clear view of the
22      suspect?

23      A.  I did then.

24      Q.  And at that time why didn't you fire your weapon?

25      A.  Because I felt the threat had not presented itself
        at that time.  The shots had already been fired, [I]
26      wanted to reassess to see what the next plan of action

27

1 would be.

2 Leibee Depo. 47:9-22.  Plaintiffs argue based on the last answer

3 that Officer Leibee did not believe deadly force was necessary

4 and thus Officer Cornelison was objectively unreasonable in

5 applying it.

6     When read in its totality, Officer Leibee's testimony does

7 not support Plaintiffs' position.  Officer Leibee testified that

8 if Officer Cornelison had not moved into his line of fire, he

9 would have fired his weapon.  Leibee Depo. 47:3-5.  The language

10 on which Plaintiff relies relates to the time immediately *after*

11 Officer Cornelison fired his weapon, i.e. Officer Leibee

12 considered firing on Foster after Officer Leibee regained his

13 clear view but did not because Officer Cornelison had already

14 fired his weapon and Officer Leibee wanted to reassess the

15 situation.  Leibee Depo. 47:19-22; 48:3-8.  Officer Leibee's

16 failure to fire his weapon does not create a genuine issue of

17 material fact.

18                      **(6) Officer Cornelison's Position & Actions**

19     Plaintiffs base much of their opposition to summary judgment

20 on the conclusions of Dr. James Cooper, who performed a second

21 look autopsy on Foster approximately two weeks after the

22 shooting.  Plaintiffs argue in sum that Officer Cornelison was

23 "closing in" on Foster as he fired his weapon and that Foster was

24 turned toward Officer Cornelison such that Officer Cornelison

25 must have been able to see that Foster was unarmed.  In order to

26 address Plaintiffs' arguments regarding the positioning of Foster

and Officer Cornelison, the four gunshot wounds must be summarized.[10]  Dr. Cooper acknowledged that it was impossible to determine which wound was inflicted first, but opined that Wound D was the first shot to hit Foster.  Cooper Depo. 43:7-14.

Wound A was a gunshot wound to the back of the right shoulder.  Gopal Rep. at 3; Cooper Decl. ¶ 7A.  It caused soft tissue injury only and was not life threatening.  "The trajectory was predominantly downward, with minor back to front and right to left components."  Cooper Decl. ¶ 7A.

Wound B was a gunshot wound to the back of the right shoulder.  Gopal Rep. at 3; Cooper Decl. ¶ 7B.  It damaged the axillary vein and was life threatening.  Cooper Decl. ¶ 7B.  The trajectory was similar to Wound A, downward with minor back to front and right to left components.  Id.

Wound C was a gunshot wound to the back of the arm.  Gopal Rep. at 4; Cooper Decl. ¶ 7C.  This shot entered the back of the right arm, exited the arm with approximately an inch of skin in between, and reentered the chest cavity.  Id.  This wound injured the lungs and was life threatening.  Cooper Decl. ¶ 7C.  The trajectory was from back to front and very slightly downwards.[11]

---

[10]  These summaries are taken in part from the declaration of Dr. Cooper and in part from the original autopsy report prepared by Dr. Gopal, which was attached as part of Exhibit 3 to Dr. Cooper's deposition.  Dr. Cooper does not dispute the findings of Dr. Gopal as to the entry wounds, Cooper Depo. 57:12-14, or the trajectories, Id. at 58:11-17.

[11]  Dr. Cooper's declaration indicates that it is "difficult to be very specific as to the original trajectory of the round," but, again, Dr. Cooper testified at his deposition that he agreed with Dr. Gopal's findings regarding the trajectories.  Supra, n.10.

1 Gopal Rep. at 4.

2 Wound D was a gunshot wound to the right side of the back.

3 Gopal Rep. at 5; Cooper Decl. ¶ 7D. This wound was lower and

4 closer to the midline than the other three. Cooper Decl. ¶ 7D.

5 It damaged the liver and was life threatening. The trajectory

6 was from back to front and slightly right to left. Id. Unlike

7 the other three wounds, there was no downward component to this

8 wound's trajectory. Id.

9 The final wound was a dog bite wound to the right side of

10 the lower back. Gopal Rep. at 6; Cooper Decl. ¶ 7E.

11 Plaintiffs argue that these wounds and trajectories

12 discredit Officer Cornelison's version of the facts because,

13 according to Dr. Cooper, "the impact points and trajectories of

14 gunshot wounds A, B and C would require a significant position

15 change in either the shooter or the victim, or both." Cooper

16 Decl. ¶ 10.

17 Officer Cornelison testified that he was approximately ten

18 to fifteen feet away from Foster at the time of the shooting.

19 Cornelison Depo. 82:2-4. As to Foster's position, Officer

20 Cornelison testified that he did not see what happened to

21 Foster's body as each shot hit him because the shots were fired

22 in rapid succession, but that he did not recall any major

23 position change, like throwing his hands up or falling down, as

24 the shots impacted Foster. Cornelison Depo. 84:1-18. Officer

25 Cornelison testified that, after all the shots were fired Foster

26 "[i]t looked like [Foster] slumped a little bit, but he was still

30

1   mostly in the same position."  Cornelison Depo. 84:21-23.

2      Dr. Cooper avers that either Officer Cornelison was standing

3   over Foster or, if Officer Cornelison's position remained the

4   same, Foster "would need to be prone, or approaching a prone

5   position, with his head toward the shooter rather than away from

6   him."  Id.  Dr. Cooper concludes that "[t]hese discrepancies

7   indicate that the sequence of events in this case could not have

8   happened the way that Officer Cornelison describes them in the

9   police report and in his deposition testimony." Cooper Decl. ¶12.

10      Plaintiffs, apparently interpreting Dr. Cooper's findings,

11   argue with respect to Wound C that it "is undisputed that this

12   bullet entered the front of Mr. Foster's shoulder first . .

13   indicat[ing] that at the time of the shot, Mr. Foster was facing

14   Officer Cornelison."  Pls.' Opp'n at 20.  Neither Dr. Gopals' nor

15   Dr. Cooper's report supports the contention that Foster was

16   facing Officer Cornelison when Wound C was inflicted.  Both

17   reports indicate that the bullet entered the back of the right

18   arm, went through the arm, and entered the chest cavity.  There

19   is no evidence to support the claim that Wound C entered the

20   front of Foster's shoulder first.

21      Plaintiffs also argue that there is a dispute as to whether

22   Officer Cornelison was moving based on the location of the

23   expended shells from Officer Cornelison's weapon.  Plaintiffs'

24   expert, Mr. Saunders, concluded from the location of these

25   shells, as depicted in the map of the scene made by the police,

26   that Officer Cornelison must have been moving as he fired his

1   weapon such that Officer Cornelison was between three and six

2   feet of Foster when Officer Cornelison fired the final round.

3   Saunders Decl. ¶¶ 12-13.

4         Putting aside for a moment that Dr. Cooper, Plaintiffs'

5   other expert, agreed that Officer Cornelison's testimony that he

6   was 10-15 feet away from Foster was consistent with his (Dr.

7   Cooper's) opinion, Cooper Depo. 90:2-5, and that Plaintiffs did

8   not dispute Defendants' UMF No. 83, which states that Officer

9   Cornelison was 10-15 feet from Foster at the time he fired,

10  Defendants correctly argue that Mr. Saunders' is not qualified to

11  render such an opinion.  Rule 702 of the Federal Rules of

12  Evidence allows admission of testimony by "a witness qualified as

13  an expert by knowledge, skill, experience, training, or

14  education."  Fed. R. Evid. 702.  In his curriculum vitae Mr.

15  Saunders purports to be an expert in the fields of police

16  procedures, training, deadly and non-deadly force, officer

17  safety, and pursuits and security.  Saunders Decl. Ex. 1.  Mr.

18  Saunders is not an expert in ballistics or crime scene

19  reconstruction.  Moreover, he has never owned or shot a .40

20  caliber Beretta, the gun used by Officer Cornelison.  Saunders

21  Depo. 59:03-06.  There is no indication that Mr. Saunders is

22  qualified to render an opinion based on a the location of the

23  shell casings.  Even if Mr. Saunders were qualified to render

24  such opinions, his conclusions with respect to this issue are

25  unreliable.  See Mukhtar v. Cal. State Univ., 299 F.3d 1053,

26  1063-64 (9th Cir. 2002) (trial court has obligation to determine

reliability of expert testimony and broad latitude in so doing).
Mr. Saunders' conclusion is based on a discussion with a range
master, whose name and affiliation Mr. Saunders could not recall,
and is not based on any further research or testing by Mr.
Saunders.  Mr. Saunders has presented no reliable basis for his
conclusions.

Mr. Saunders also concludes that Officer Cornelison's
description of the scene is implausible because "if Saxon had
been biting Mr. Foster when Russell Cornelison fired his weapon,
as the officer claims, the dog would have been in the direct
line-of-fire and would more than likely have been hit by one or
more of those bullets.  Obviously, according to the police
report, that did not happen."  Saunders Decl. ¶ 14.  Again, Mr.
Saunders is not an expert in handling and training of canines or
canine officers.  Also, his conclusion is unsupported by any
physical evidence and is speculation.  Moreover, as Officer
Cornelison testified, police canines are trained to be neutral
to, i.e. ignore, gunfire.  Cornelison Depo. 94:1-4.  Even if
Officer Cornelison did disregard the safety of Saxon, this is a
tactical error that does not create a genuine issue of material
fact as to the respective positions of Foster and Officer
Cornelison.

Assuming, arguendo, as Dr. Cooper opines, that Foster's
position changed or that Officer Cornelison approached Foster,[12]

---

[12]  None of the officers testified that Officer Cornelison was,
at any time, standing directly above Foster and firing into him.

33

1  it nonetheless remains that all of the entry wounds are on the

2  back of Foster's body and all of the trajectories are from back

3  to front.  This physical evidence is consistent with Officer

4  Cornelison's testimony that at no time could he see Foster's

5  hands.  There is no physical evidence to support Plaintiffs'

6  contention that Foster turned around and faced Officer

7  Cornelison.[13]  It will be assumed for purposes of this motion

8  that Foster was approaching a prone or semi-prone position, but

9  that he did not turn around.

10              **(7) The Shots Were Fired in Rapid Succession**

11      Plaintiffs argue that there is a dispute as to the timing of

12  the shots.  Plaintiffs assert that "[t]here was a pause between

13  the first shot and the second round of shots."  Pls.' Opp'n at

14  18.  Defendants argue that all three officers indicated that the

15  four shots were fired in rapid succession.  <u>See</u> Cornelison Decl.

16  ¶ 30; Leibee Decl. ¶ 25; Suarez Decl. ¶ 23.

17      Plaintiffs argue that a statement made by Officer Suarez in

18  an interview the morning following the shooting undermines this.

19  Pyle Decl. Ex. D.  Officer Suarez described the shots to

20  Detective Garcia as follows: "I heard *a shot or two*.  I can't

21  remember how many shots were fired."  <u>Id.</u>  (emphasis added).  In

22  his deposition, Officer Suarez testified as follows: "Q.  And

23

24      [13]  The trajectories for Wounds A, B, and D were described by
    Dr. Gopal as being slightly right to left, Gopal Rep. at 3-5, which
25  indicates that, at most, Foster was in the process of turning and
    further undermines Plaintiffs' argument that Foster turned around
26  and faced Officer Cornelison.

1   were the shots fired, did they come right after one another, bam,

2   bam, bam, bam, like that . . . ?  A.  To me it appeared that they

3   did."  Suarez Depo. 50:20-23.  Officer Suarez's earlier assertion

4   that he hear one or two shots is not inconsistent with his later

5   sworn testimony that he heard shots fired in rapid succession.

6   The interview cited by Plaintiffs is not evidence from which a

7   jury could reasonably find that a pause occurred.  It is thus

8   undisputed that Officer Cornelison shot Foster four times in

9   rapid succession.

10        **3.  Analysis**

11        The undisputed facts and the disputed facts that are viewed

12  in the light most favorable to Plaintiffs are summarized as

13  follows: Foster was a suspect in a series of armed robberies, a

14  dangerous felony; Foster had fled and had been attempting to

15  evade arrest; Officer Cornelison reasonably believed that Foster

16  was armed with a gun; Foster did not respond to the officers'

17  commands; Foster did not significantly respond to the application

18  of Saxon initially, but the dog was successful at extracting

19  Foster from the bushes; Foster raised his arm up; Foster moved

20  his arm down toward his waistband area, but did not "jam" his

21  hand down or fumble around; Officer Leibee characterized the

22  motion as "threatening" and would have fired but for Officer

23  Cornelison's moving into his line of fire; Officer Cornelison

24  fired four shots in rapid succession; the shots hit Foster on his

25  back and the back of his right arm and shoulder; and as Officer

26  Cornelison fired, Foster changed position and became more prone

1   or semi-prone.

2       Bearing in mind the "broad discretion that must be afforded

3   to police officers who face a tense situation," Jeffers, supra,

4   267 F.3d at 909, and that reasonableness "must be judged from the

5   perspective of a reasonable officer on the scene, rather than

6   with the 20/20 vision of hindsight," Graham, supra, 490 U.S. at

7   396, a reasonable officer in Officer Cornelison's position would

8   have believed that Foster posed an immediate threat of serious

9   harm.  Officer Cornelison's application of deadly force was thus

10  objectively reasonable.

11      Neither the physical evidence put forth by Plaintiffs nor

12  the minor inconsistencies in the officers' versions of the

13  situation create a dispute as to the critical facts in this case:

14  that Officer Cornelison reasonably believed Foster was armed and

15  that all three officers saw Foster move his arm down.  It is

16  these undisputed facts that provided Officer Cornelison with

17  probable cause to use deadly force.  Whether Foster or Officer

18  Cornelison moved after the shots were fired is irrelevant to the

19  question of whether Foster posed an immediate threat immediately

20  before the shots were fired.  Similarly, the tactical errors put

21  forth by Plaintiffs' expert, Mr. Saunders, are "nothing but 20/20

22  hindsight that take[] no account of the need to act in emergency

23  situations."  Billington, supra, 292 F.3d at 1191.

24      This determination is consistent with the recent Ninth

25  Circuit decision of Blanford v. Sacramento County, 406 F.3d 1110

26  (9th Cir. 2005), in which the Ninth Circuit upheld summary

judgment on the constitutional question.[14]  There, the plaintiff, Blanford, was carrying an edged sword and was shot and severely injured by police after he ignored commands to stop and drop the sword and attempted to enter a house that, unbeknownst to the officers, was actually his house.  Id. at 1112.  The court found the officers' shooting of Blanford objectively reasonable because the officers had probable cause to believe that Blanford "posed a threat of serious physical harm to [the officers], or to others, because he was armed, refused to give up his weapon, was not surrounded, and was trying to get inside a private residence or in default of that, into the back yard, where his sword *could inflict injury* that the deputies would not have been in a position to prevent."  Id. at 1117-18 (emphasis added).  The court also found that a second and third round of shots were objectively reasonable because "the deputies knew that Blanford had committed a crime, albeit not a violent one, and was continuing a course of conduct that objectively indicated he was not giving up the sword that made him a threat to anyone in charging range."  Id. at 1118-19.

Here, unlike in Blanford, Foster was suspected of committing a violent crime, armed robbery, and had fled the scene of a car accident in an attempt to evade arrest.  Most important, here, Foster made a move that Officer Cornelison reasonably believed

---

[14]  The court decided the issue on the constitutional question, but also upheld summary judgment in the alternative on the clearly established question.  Blanford, 406 F.3d at

37

1    posed an immediate threat because the officers believed Foster

2    was armed at the time.  In contrast, in <u>Blanford</u>, the court found

3    no constitutional violation despite the fact that Blanford did

4    not actually make a threatening movement toward the officers.

5    <u>Blanford</u>, 406 F.3d at 1120 (Noonan, J., dissenting) ("the

6    significant threat must also be immediate . . . [t]he officers

7    have not been able to name a single human being who was

8    significantly or immediately threatened by Matthew Blanford" ).

9        The undisputed facts in this case demonstrate that Officer

10   Cornelison's actions were objectively reasonable.  Accordingly,

11   no constitutional violation of Foster's rights occurred and

12   summary judgment as to Plaintiffs' first claim is GRANTED.  As a

13   result, Defendants are also entitled to summary judgment as to

14   Plaintiffs' second cause of action for violation of their own due

15   process rights, and it is hereby GRANTED.

16       **B.  Was the Right Clearly Established at the Time?**

17       The determination that no constitutional right was violated

18   obviates a need for discussion of the second prong of the <u>Saucier</u>

19   test.  <u>See</u> <u>Saucier</u>, 533 U.S. at 201; <u>Billington</u>, 292 F.3d at

20   1191.

21   **VI.  Plaintiffs' Remaining State Law Claims**

22       Defendants argue that they are entitled to summary judgment

23   as to Plaintiffs' remaining state law claims, claims five through

24   eight, because Officer Cornelison is immune from liability under

25   California law.

26       Section 196 of the California Penal Code provides that a

38

1  homicide committed by an officer is justifiable if it was

2  "necessarily committed in overcoming actual resistance to the

3  execution of some legal process, or in the discharge of any other

4  legal duty; or . . . when necessarily committed in arresting

5  persons charged with felony, and who are fleeing from justice or

6  resisting such arrest."  Cal. Pen. Code § 196.  "There can be no

7  civil liability under California law as the result of a

8  justifiable homicide."  Martinez v. County of Los Angeles, 47

9  Cal. App. 4th 334, 349 (1996) (finding immunity pursuant to

10  section 820.2 of the California Government Code[15] where force

11  used was determined reasonable).

12      Under California law, an officer may use deadly force to

13  effect an arrest "only if the felony for which the arrest is

14  sought is 'a forcible, and atrocious one which threatens death or

15  serious bodily harm, or there are other circumstances which

16  reasonably create a fear of death or serious bodily harm to the

17  officer or to another.'"  Ting v. United States, 927 F.2d 1504,

18  1514 (9th Cir. 1991) (quoting Kortum v. Alkire, 69 Cal. App. 3d

19  325, 333 (1977) (interpreting Cal. Pen. Code § 196)).

20      Here, as discussed, Foster was the suspect in a series of

21  armed robberies, a dangerous felony.  Also as discussed, Officer

22  Cornelison reasonably believed that Foster posed an immediate

23

24      [15] Section 820.2 provides that "[e]xcept as otherwise provided
    by statute, a public employee is not liable for an injury resulting
25  from his act or omission where the act or omission was the result
    of the exercise of the discretion vested in him, whether or not
26  such discretion be abused."  Cal. Govt. Code § 820.2.

1   threat of death or serious bodily injury when Foster, who was

2   believed to be armed, refused to comply with the officers' orders

3   and returned his hand to his waistband area.  Accordingly,

4   Officer Cornelison is entitled to immunity under California law.

5   See Martinez, 47 Cal. App. 4th at 349-350.

6       Section 815.2 of the California Government Code provides

7   that a city cannot be liable for the acts of its employee if the

8   employee is immune from liability.  Cal. Govt. Code § 815.2.

9   Because Officer Cornelison is immune from liability, there can be

10  no liability on the part of Defendant Dyer or the City.

11      Accordingly, summary judgment is GRANTED as to Plaintiffs'

12  remaining state law claims.

13      **ACCORDINGLY, IT IS ORDERED** that Defendants' motion for

14  summary judgment is hereby GRANTED for the reasons set forth

15  above.

16

17  IT IS SO ORDERED.

18  **Dated:  July 12, 2005**              **/s/ Robert E. Coyle**
    ia40ij                          UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

40